IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

UNITED STATES OF AMERICA, :
:
      Plaintiff, :
:   Case No. 2:09-cr-49
v. :   JUDGE ALGENON L. MARBLEY
:
FODE AMADOU FOFANA, :
:
      Defendant. :

## OPINION & ORDER

### I. INTRODUCTION

This matter is before the Court on Defendant Fode Fofana's ("Fofana") Motion to Suppress Physical Evidence (doc. no. 15). Fofana alleges that the evidence in question was obtained as the result of an airport checkpoint search at the Port Columbus International Airport that violated his right to be free from unreasonable searches and seizures under the Fourth Amendment of the United States Constitution. For the reasons set forth herein, this Court **GRANTS** the Defendant's Motion.

### II. FACTS

The Court held a suppression hearing on May 13, 2009. At the hearing the Court heard the testimony of Transportation Security Administration ("TSA") Agents Mirow and Stroud who participated in Fofana's search. The Court also viewed the video surveillance tapes of the search. Fofana and Perry Doran, the Assistant Federal Security Director for Law Enforcement at Port Columbus Airport, did not testify at the hearing but submitted affidavit testimony.

On January 31, 2009, Fofana arrived at the Port Columbus International Airport and bought a ticket for a domestic Delta Airlines flight. His boarding pass was "flagged" by the airline, identifying him as a "Selectee" for secondary screening. The Selectee designation is made by the airline pursuant to Security Directives issued by the Transportation Security Administration ("TSA"). A Selectee is subjected to a thorough secondary search at the security checkpoint in addition to the general metal detector walkthrough and x-ray of baggage.

A passenger may be flagged as a Selectee for several reasons. Possible reasons include the passenger's inclusion on the FBI's Terrorist Screening Center list of people with possible links to terrorism or the passenger's selection based on a "Computer Assisted Passenger Prescreening System," which selects individuals for enhanced screening based on travel characteristics identified by the TSA as indicating potential security risks. The record is silent on why Fofana's ticket was flagged for secondary screening.

After getting his boarding pass, Fofana proceeded to the security checkpoint. At the checkpoint, Fofana presented a valid state driver's license in the name of Fode Fofana. The TSA agent who reviewed Fofana's boarding pass noted that he was a Selectee for secondary screening. Agent Tarah Stroud ("Stroud") put Fofana's bags on the scanner belt and directed Fofana to remove all of his belongings from his pockets and put them on the belt. (5/13/2009 Hr'g Tr. 49-50.) Fofana walked through the metal detector without setting off the alarm.

On the other side of the metal detector, TSA Agent Gregory Mirow ("Mirow"), the checkpoint supervisor, searched Fofana with a handheld magnetic wand. After that, he patted Fofana down with his hands and felt bulky items in his front pockets. Mirow asked Fofana to remove the items from his pockets one at a time and saw that the bulky items were wads of money. Mirow instructed Fofana to fan the money out so he could ensure that there was nothing

-2-

hidden inside. Fofana did so and Mirow told him to put the money back in his pockets. Mirow then escorted Fofana to the secured area of the checkpoint where he could wait to collect his baggage and could watch it being searched.

While Fofana was being patted down, Stroud ran his bags through the x-ray belt. The bags did not alarm. Because Fofana had been selected for secondary screening, his bags were also subject to a through hand search, which Stroud performed. She swabbed the bags and their contents for explosive traces and looked for items on the "prohibited items" list, such as guns or knives. During the search, she emptied the bags of their contents.

Stroud explained that, because Fofana was a Selectee, she was required to search for "anything that might compromise the safety of an airplane, its crew and the traveling public." (5/13/2009 Hr'g Tr. 78.) She claims she was also responsible for taking "notice of anything that might suggest that Fofana could have been someone other than the person he claimed to be, such as identification documents or credit cards bearing a different name." (Stroud Aff. ¶ 3; 5/13/2009 Hr'g Tr. 78.) She states that she was also supposed to be "alert for anything that might be unlawful for him to possess, such as credit cards belonging to other people, illegal drugs, or counterfeit money" and to report any possibly illegal items to her supervisor, who would contact a law enforcement officer. (Stroud Aff. ¶ 3; 5/13/2009 Hr'g Tr. 78.)

Perry Doran, the Assistant Federal Security Director for Law Enforcement at Port Columbus Airport, corroborated Stroud's description of TSA search procedures. According to Doran's affidavit, "[p]ositively identifying passengers is an important tool in TSA's multi-layered approach to security." (Doran Aff. ¶1.) He further explained that "when a passenger is selected for additional screening-as was the case with Mr. Fofana-[TSA agents] look not only for prohibited items, but other items that might be relevant to security" such as "other forms of ID

that might be within the passenger's luggage or other items . . . which might call into question the identity the passenger has asserted." (Doran Aff. ¶13.)

During the course of her search, Stroud found between fourteen and sixteen envelopes. As she found them she placed the envelopes in a bin so she could check them later. Stroud testified that she could tell by the feel and size of the items that most of the envelopes contained cash. According to Stroud a couple of the envelopes were sealed but the rest were not.[1] She looked into a few of the unsealed envelopes and saw that they contained cash. She did not open all of the cash envelopes, however, because she could tell what was inside by touch. (5/13/2009 Hr'g Tr. 66.)

According to Stroud, money is not a prohibited item "but in large quantities it is suspicious." (5/13/2009 Hr'g Tr. 58.) She testified that screeners were trained to notify a supervisor if they found a large amount of money, which she defined as $10,000 to $15,000. Stroud explained that she understood that carrying a large amount of money was suspicious because "[i]f it wasn't for an illegal or fraudulent purpose, then of course it would be in a bank or you could write a check or use your bank card." (5/13/2009 Hr'g Tr. 58-59.) According to both Stroud and Mirow, the TSA's SOP encourages screeners to report discoveries of large amounts of cash to an appropriate law enforcement contact. (5/13/2009 Hr'g Tr. 24-26, 59.)

She also found an unsealed envelope that felt different from the cash filled envelopes. That envelope contained something hard and unbendable, but Stroud could not tell what it was by touch. She looked inside and found a passport. She found another rigid envelope, which contained a second passport. Both passports had Fofana's picture but different names. Based on her training, she informed her lead screener about the passports. After searching further, Stroud

---

[1] Fofana claims that the envelopes were all sealed.

found a third unsealed envelope that contained yet another passport with Fofana's picture and a third name. Stroud took the third passport to her lead screener.

Stroud testified that the passports were a cause for concern "because it is our job to verify that the person coming into the airport is who they say they are." (5/13/2009 Hr'g Tr. 69.) Stroud admitted that at the time she found these envelopes, Fofana's bags had already been through the x-ray machine and had been checked for explosive residue. She testified that she felt the envelopes "because it is our responsibility to clear all personal items that a passenger carries." (5/13/2009 Hr'g Tr. 96-97.) She admitted, however, that when she opened the envelopes she did not believe that they contained weapons or explosives, but instead was looking for contraband. (5/13/2009 Hr'g Tr. 97-99.) Stroud testified that money, passports, and envelopes containing mail are not prohibited items. (5/13/2009 Hr'g Tr. 99.)

When Agent Mirow learned that the passports had been found, he contacted law enforcement officers who came to the checkpoint. Mirow testified that he did so based on a written protocol which instructed agents to contact law enforcement officers, security managers and other officials "to let them know there may be some cause for concern over the true identity of a passenger presenting himself to fly out." (5/13/2009 Hr'g Tr. 29-20.) Fofana was subsequently arrested.

On March 3, 2009 Fofana was indicted. Three counts of the indictment relate to the passports seized after the airport search. Counts 1-3 charge him with the possession of three falsely made or forged passports in violation of 17 U.S.C. § 1546(a). Count 4 charges him with attempted bank fraud in violation of 18 U.S.C. § 1344. Count 5 charges him with using one of the fake passports in connection with the attempted bank fraud charged in Count 4, in violation

-5-

of 18 U.S.C. § 1028A(a)(1). Fofana moved to suppress the evidence found in the search. The Government opposes.

### III. LAW & ANALYSIS

Under the Fourth Amendment, searches "conducted without a warrant issued upon probable cause [are] per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (internal quotation marks omitted); *see also Katz v. United States*, 389 U.S. 347, 357 (1967). The Government bears the burden of proving that a warrantless search was conducted pursuant to an established exception to the Fourth Amendment warrant requirement. *United States v. Oliver*, 686 F.2d 356, 371 (6th Cir. 1982). Administrative searches are an exception to the warrant requirement and are permissible if they "meet the Fourth Amendment's standard of reasonableness." *United States v. Davis*, 482 F.2d 893, 910 (9th Cir. 1973), *overruled on other grounds by United States v. Aukai*, 497 F.3d 955, 960-61 (9th Cir. 2007) (en banc); *see also Board of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cty. v. Earls*, 536 U.S. 822, 828-29 (2002) (noting that reasonableness is "the touchstone of the constitutionality of a governmental search"); *Camara v. Mun. Court*, 387 U.S. 523, 536-537 (1967).

Warrantless and suspicionless airport screening searches are administrative searches and, therefore, exempt from the warrant requirement and constitutionally permissible if they are reasonable .[2] *See., e.g., United States v. Dalpiaz*, 494 F.2d 374, 375 (6th Cir. 1974); *Aukai*, 497

---

[2] The Supreme Court has not directly ruled on the reasonableness of domestic airport checkpoint searches. The Supreme Court has suggested that such searches are permissible administrative searches in dicta. *City of Indianapolis v. Edmond*, 531 U.S. 32, 47-48 (2000) (noting that its ruling did not "affect the validity of . . . searches at places like airports . . ."); *Chandler v. Miller*, 520 U.S. 305, 323 (1997) (noting that suspicionless searches such as "searches now routine at airports" may be reasonable under Fourth Amendment standards); *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 675 n.3 (1989) (noting favorably the Federal Government's practice of suspicionless searches of airline passengers and luggage and the lower courts'

F.3d at 958; *United States v. Hartwell*, 436 F.3d 174, 178 (3d Cir. 2006). This is so because they are conducted as part of a general regulatory scheme to prevent passengers from carrying weapons or explosives onto airplanes rather than as part of a criminal investigation to obtain evidence of criminal activity. *Aukai*, 497 F.3d at 960; *Dalpiaz*, 494 F.2d at 375.

To determine the reasonableness of an administrative airport search, the Court must balance an individual's right to be free of intrusion with "society's interest in safe air travel." *United States v. Marquez*, 410 F.3d 612, 616 (9th Cir. 2005) (quoting *United States v. Pulido-Baquerizo*, 800 F.2d 899, 901 (9th Cir. 1986)). Therefore, an airport security search is reasonable if: (1) the search is "no more extensive or intensive than necessary, in light of current technology, to detect the presence of weapons or explosives;" (2) the search "is confined in good faith to that purpose;" and (3) a potential passenger may avoid the search by choosing not to fly. *Aukai*, 497 F.3d at 962. The mere fact that contraband other than weapons or explosives is found during an airport screening search, however, does not itself render the search unconstitutional. *Marquez*, 410 F.3d at 616.

The TSA is statutorily charged with developing and executing airport screening search procedures. 49 U.S.C. § 44901(a). More generally, the TSA is responsible for creating "regulations to protect passengers and property on an aircraft . . . against an act of criminal violence or aircraft piracy." 49 U.S.C. § 44903(b). Under 49 C.F.R. § 1540.111(a), individuals may not carry a "weapon, explosive, or incendiary" onto an airplane. Section 49 U.S.C.§ 44902(a) requires that the TSA prohibit commercial airlines from transporting "a passenger who does not consent to a search under section 44901(a) of this title establishing whether the passenger is carrying unlawfully a dangerous weapon, explosive, or other destructive substance."

---

findings that such searches are reasonable administrative searches under the Fourth Amendment).

Pursuant to its mandate, the TSA has established a "prohibited items list" which is posted online and sets forth what items may not be carried aboard aircraft. 68 Fed. Reg. 7444. The prohibited list includes a number of small items such as razors, matchbooks, and blasting caps. http://www.tsa.gov/assets/pdf/prohibited_items_brochure.pdf.

Fofana does not challenge his selection for secondary screening, but rather argues that the hand search of his luggage went beyond the permissible scope of an airport screening search because Agent Stroud had already determined that he was not carrying weapons or explosives when she decided to open the envelopes containing the passports. He further argues that his search exceeded the TSA's statutory mandate under 49 U.S.C. § 44902(a) and 49 C.F.R. 1540.111. He reasons that under 49 U.S.C. § 44902(a) and 49 C.F.R. 1540.111, the TSA is only permitted to search passengers and their belongings to detect dangerous weapons, explosives, or other destructive substances. He contends, therefore, that the TSA exceeded its statutory authority by opening the envelopes after his bags had been cleared of any suspicion that they contained weapons, explosives, or prohibited items.

The Government counters that Stroud's search was reasonable because she could not tell what was in the envelopes. The Government reasons that the envelopes could have contained razor blades that were too small to have been detected by the x-ray machine, plastic knives, or other small items which could pose a threat to an airplane and its passengers. Accordingly, the Government argues that it was necessary to open the envelopes to ensure that Fofana's bags did not contain prohibited items.

The case law dealing with airport checkpoint searches teaches that a checkpoint search tainted by "general law enforcement objectives" such as uncovering contraband evidencing general criminal activity is improper. *See, e.g., United States v. $124,570 U.S. Currency*, 873

F.2d 1240, 1244 (9th Cir. 1989); *Marquez*, 410 F.3d at 617 (approving airport screening search where "nothing in the record indicat[ed] that [the searching agent] was looking for drugs or criminal evidence"); *Pulido-Baquerizo*, 800 F.2d at 902 (holding that the visual inspection and hand search of a passenger's luggage was constitutional where it was "used for the purpose of detecting weapons or explosives and not in order to uncover other types of contraband"); *United States v. Epperson*, 454 F.2d 769, 771 (4th Cir. 1972) (holding that searches "for the sole purpose of discovering weapons and preventing air piracy and not for the purpose of discovering weapons and pre-criminal events" was constitutionally permissible). That conclusion is further supported by the Supreme Court's repeated instruction that administrative searches may not be justified by a desire to detect "evidence of ordinary criminal wrongdoing." *City of Indianapolis v. Edmond*, 531 U.S. 32, 37-42 (2000) (collecting cases). Therefore, to the extent that airport administrative searches are used for purposes other than screening luggage and passengers for weapons or explosives, they fall outside the rationale by which they have been approved as an exception to the warrant requirement, and the evidence obtained during such a search should be excluded. *$124,570 U.S. Currency*, 873 F.2d at 1243.

In *$124,570 U.S. Currency*, the Ninth Circuit invalidated an airport screening search as constitutionally unreasonable because it was motivated by the screening agent's desire to detect and report U.S. customs violations pursuant to a reporting policy, rather than to uncover weapons or explosives. *Id.* at 1246-47. The court found that the screening agency had a policy of "encouraging agents to report the presence of 'drugs and U.S. currency' to the U.S. Customs and Port police" and cooperating with them to detect and report such items. *Id.* at 1245. In fact, screening agents received a $250 reward for doing so. *Id.* at 1241. Pursuant to that policy, the screening agents notified a customs official about the defendant after finding a very large

-9-

quantity of cash in the defendant's bag, detaining the defendant, and asking him about his travel destination. *Id*. at 1241. The customs official notified a Drug Enforcement Administration agent and the defendant was subsequently searched by DEA agents. A civil forfeiture action was filed as a result of the DEA search. *Id*. at 1242.

The court concluded that the search preformed by the screening agents could not be justified as an administrative search. *Id*. at 1247. The court reasoned that "[h]aving found no weapons or explosives in [the defendant's] bag [the screening agent's] legitimate interest in [the defendant's] identity was at an end; there was no further safety-related justification for detaining [the defendant] and prying into his affairs." *Id*. at 1246. The court concluded that the searching agent was motivated by a desire to help law enforcement authorities and obtain a reward. *Id*. As such, the reporting policy had "effectively transform[ed] a limited check for weapons and explosives into a general search for evidence of crime." *Id*. at 1247.

Similarly, the evidence in this case shows that the extent of the search went beyond the permissible purpose of detecting weapons and explosives and was instead motivated by a desire to uncover contraband evidencing ordinary criminal wrongdoing. From their testimony at the suppression hearing it appeared that both Mirow and Stroud considered Fofana to be suspicious based on the fact that he was carrying a large amount of cash, but that the "suspicion" was not based on a concern that he was a security risk. Instead, they were concerned that he must have possessed the cash for illegal or fraudulent purposes. (*See* 5/13/2009 Hr'g Tr. 58-59.) Also, like the screening agency in *$124,570 U.S. Currency*, Mirow and Stroud testified that the TSA had a policy of directing its agents to report large quantities of cash to other law enforcement agencies. (5/13/2009 Hr'g Tr. 24-26, 58-59.) Mirow also testified that, like the agent in *$124,570 U.S. Currency*, he would inquire about a passenger's destination if he saw that the passenger was

carrying a large amount of cash, presumably to aid customs officials in detaining passengers when they are reported as potential customs law violators. (5/13/2009 Hr'g Tr. at 38.)

Contrary to the requirements of *Edmund* and *$124,570 U.S. Currency*, Stroud testified that she opened the envelopes to look for contraband evidencing criminal wrongdoing, not to detect prohibited items within the envelopes. Specifically, she testified as follows:

> THE COURT: Did you think that the envelope contained a weapon?
>
> THE WITNESS: No. It is very unlikely that it would have contained a weapon because it already went through the x-ray machine and that's what they were checking for in the x-ray machine.
>
> THE COURT: Did you think it contained some type of explosive?
>
> THE WITNESS: No, I did not.
>
> THE COURT: Did you think that it contained money?
>
> THE WITNESS: No, I did not.
>
> THE COURT: Did you think that it contained contraband?
>
> THE WITNESS: I did not know. That's what I was checking for.
>
> THE COURT: So you were checking the envelope for contraband?
>
> THE WITNESS: Yes
>
> THE COURT: Do you have a protocol, a written protocol, that directs you or requires you to check for contraband? Let me be more precise: contraband that you do not believe either to be a weapon or explosive device?
>
> THE WITNESS: You're asking if we have a written --
>
> THE COURT: Yes.
>
> THE WITNESS: In our SOP, as I stated, there are procedures. There are things we look for that are suspicious that are contraband.

(5/13/2009 Hr'g Tr. 97-99.) Mirow testified that TSA agents "always look through all paper that comes through" including paper contained in books wallets or "any containment-type device."

(5/13/2009 Hr'g Tr. 40.) That evidence, however, was contradicted by Stroud who testified that she did not look through all of the envelopes filled with cash because she could feel that there was paper money inside. (5/13/2009 Hr'g Tr. 66.)

The evidence also established that before the envelopes were opened, Fofana's bags had already been thoroughly searched and that opening the envelopes containing the passports did not serve safety-related ends. By the time the envelopes were opened, the bags had been examined through the x-ray machine, tested for explosives residue, and emptied during a thorough hand search by Stroud. Stroud had also already manipulated the envelopes by hand, discovering that they were thin and unbendable. Although Mirow testified that a bulky "mass" of paper, such as 100 one-dollar bills or a book, would need to be investigated to ensure that nothing dangerous was disguised within the mass, his testimony suggests that something as thin as a passport would not be bulky enough to trigger that concern. (5/13/2009 Hr'g Tr. 40-42 (testifying that 5 bills would not be bulky enough to require scrutiny).)

The Government argues that Stroud's subjective intent is irrelevant because, in the context of administrative searches, the purpose driving the search is assessed at the programmatic level. *Edmund*, 531 U.S. at 44-47 (explaining that cases dealing with administrative searches "have often required an inquiry into purpose at the programmatic level"). But, the Government failed to establish through evidence that opening the envelopes containing the passports was necessary to serve the programmatic purpose of an airport screening search, i.e., to unearth weapons or explosives. As already explained, the bulk of the evidence presented suggests that it was not. While it is conceivable that, as the Government argues, an envelope containing a passport-sized item might need to be opened, despite the use of other screening technologies, to detect a small prohibited item hidden inside, the Government has not supported

that argument with evidence. For example, the TSA did not present, or submit for *in camera* review, SOPs or other regulations stating that all items, including non-bulky business-sized envelopes, must be opened as part of a secondary screening to ensure that there are no prohibited items are contained within.[3] It is equally conceivable to the Court that a combination of x-ray screening and external manipulation would be sufficient to exclude the presence of weapons or explosives in the envelopes Fofana was carrying. In fact, Stroud testified to that effect. (5/13/2009 Hr'g Tr. 97-99.)

Quite simply the Government failed to produce evidence from which this Court could conclude that the search of Fofana's luggage was "no more extensive or intensive than necessary, in light of current technology, to detect the presence of weapons or explosives;" or that the search was "confined in good faith to that purpose."[4] *Aukai*, 497 F.3d at 962. As the Government bears the burden of establishing that a search was constitutional, that failure is outcome determinative and the Court must grant Fofana's Motion to Suppress.

---

[3] The Court is aware that the details of the TSA's screening procedures may be classified as "sensitive security information" ("SSI") by the Under Secretary of the TSA pursuant to 49 U.S.C. § 114(s)(1)(c) and 49 C.F.R. § 1520.5. The Court suggested during the suppression hearing, however, that any such materials could be submitted to the Court for an *in-camera*, *ex parte* review. (5/13/2009 Hr'g Tr. 27-28); *See Gilmore*, 435 F.3d at 1131 (ordering the TSA to submit SSI under seal for *in camera*, *ex parte* review of the relevant policy). The Government did not do so.

[4] The Government suggested in its initial briefing that opening the envelopes was reasonable because TSA needs to accurately identify passengers and, therefore, searching for evidence of a passenger's identity serves a security purpose. (Doc. No. 17, Mem. Contra. 3.) The Government appears to have abandoned this novel argument in its post-suppression hearing briefs, which instead claim that opening the envelopes was necessary to detect weapons or explosives. (Doc No. 28, Post-Hearing Mem. Contra 4; Doc. No. 30, Response Br. 2.) Therefore, the Court will not address the identification search theory. The Court notes, however, that the evidence presented at the suppression hearing would likely not support such a claim as Fofana presented a valid driver's license at the security checkpoint and there was no evidence that his identity was called into question until after the passports were found. Furthermore, there was no evidence that Stroud opened the envelopes because she was looking for identification documents or that TSA agents are generally trained to open containers merely to determine whether they contain identification documents.

In ruling on Fofana's motion, this Court is cognizant of the weighty concerns on both sides of the matter. The Court fully appreciates the "paramount importance" of preventing air piracy and terrorist attacks on airplanes and the central role that TSA screening procedures play in ensuring passenger and aircraft safety. *See, e.g., Hartwell*, 436 F.3d at 179 (collecting cases). In light of recent history, it cannot be seriously debated that the need for airport security searches is "particularly acute." *Edmond*, 531 U.S. at 47-48. In recognition of the vital need for passenger security, courts have upheld a wide variety of checkpoint search procedures against Fourth Amendment challenges. *See, e.g., Marquez*, 410 F.3d at 614 (approving random, suspicionless selection of defendant for secondary screening procedure, which included a wanding with a handheld magnetometer); *Gilmore v. Gonzales*, 435 F.3d 1125, 1129, 1138 (9th Cir. 2006) (upholding TSA identification policy that required defendant to present identification or be subject to a more extensive search procedure that included a handheld magnetometer scan, patdown search, shoe removal, and a CAT-scan and hand search of his baggage).

Nevertheless, the Court is equally aware of the importance of the protection granted by the Fourth Amendment and the fact that individuals have a privacy interest in the contents of their luggage. *United States v. Place*, 462 U.S. 696, 707 (1983) ("We have affirmed that a person possesses a privacy interest in the contents of personal luggage that is protected by the Fourth Amendment."). As the Supreme Court recently stated, the "central concern underlying the Fourth Amendment" was about "giving police officers unbridled discretion to rummage at will among a person's private effects." *Arizona v. Grant*, 129 S.Ct. 1710, 1720 (2009). That concern is implicated if airport checkpoint searches are permitted to balloon from "narrowly defined searches for guns and explosives . . . justified by the need for air traffic safety" into "generalized law enforcement search[es] of all passengers as a condition for boarding a

commercial aircraft." *See $124,570 U.S. Currency*, 873 F.2d at 1243. In other words, the need for heightened security does not render every conceivable checkpoint search procedure constitutionally reasonable. *Id*.

In reaching this conclusion, the Court in no way suggests that secondary screening of passengers, including a hand search of the passenger's luggage cannot be justified as administrative searches that serve the purpose of detecting weapons and explosives in some, or even most, cases. Furthermore, the Court recognizes that contraband discovered in the course of an otherwise constitutionally reasonable airport search may be reported to law enforcement officials. *Marquez*, 410 F.3d at 616; *United States v. $557,993.89, More or Less in U.S. Funds*, 287 F.3d 66, 81-83 (2d Cir. 2002) (finding airport search that was properly limited in scope to the detection of weapons was not invalidated merely because searching agent discovered money orders evidencing other wrongdoing); *$124,570 U.S. Currency*, 873 F.2d at 1247 n.7 (noting that airport checkpoint agents are not prohibited from "reporting information pertaining to criminal activity, as would any citizen"). The Court merely holds that where, as here, the evidence demonstrates that the intrusiveness of a passenger's search was ramped-up based on a desire to detect evidence of ordinary criminal wrongdoing, after the presence of weapons and explosives had been ruled out, the search can no longer be justified under the administrative search doctrine and suppression is appropriate.[5]  *$124,570 U.S. Currency*, 873 F.2d at 1247.

---

[5] The Government also argues that even if the search violated Fofana's Fourth Amendment rights, this Court should employ the good faith exception to the exclusionary rule and refuse to suppress the evidence. *See United States v. Leon*, 468 U.S. 897 (1984) (creating the good faith exception). The good faith exception, however, is premised on the executing officer's reliance on a presumptively valid *warrant* that later turns out not to have been supported by probable cause. *Leon*, 468 U.S. at 922; 1 Charles Alan Wright, Federal Practice & Procedure, § 52. Therefore, it has no application in the context of a warrantless administrative search. This Court is unaware of if it ever having been applied in the context of an airport screening search and declines to extend its application to the facts of this case.

## IV. CONCLUSION

For the reasons explained above, the Court **GRANTS** Defendant's Motion to Suppress. Any evidence that was seized or subsequently obtained as a result of Fofana's unlawful search, including the three passports, will be suppressed.

**IT IS SO ORDERED.**

    **s/Algenon L. Marbley**
**ALGENON L. MARBLEY**
**United States District Court Judge**

**DATE: June 2, 2009**